# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :

       v.                       :          **CRIMINAL NO. 25-506**

KEVIN KREBS             :

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Everett R. Witherell and Frank Menna, Assistant United States Attorneys, hereby submits this Sentencing Memorandum.

Defendant Kevin Krebs stands before the Court having pleaded guilty to possessing unregistered destructive devices in violation of 26 U.S.C. § 5861(d). The advisory guideline range is 30 to 37 months' imprisonment. For the reasons set forth below, the government respectfully submits that a sentence within that guideline range is necessary and appropriate under 18 U.S.C. § 3553(a).

This case does not involve a single improvised device, an isolated lapse in judgment, or the possession of inert materials. Rather, law enforcement recovered multiple improvised explosive devices, numerous improvised detonators, explosive precursor materials, and detailed plans relating to explosive weapons from the defendant's residence. Several of the devices were readily capable of being rendered functional with minimal additional steps. Others already contained energetic material, initiation systems, or both. The danger posed by the defendant's conduct was substantial and extended not only to members of the public but also to the law enforcement officers and bomb technicians required to secure the devices.

A guideline sentence appropriately reflects the seriousness of the offense, promotes respect for the law, provides just punishment, and protects the public from further dangerous conduct.

## I.    <u>INTRODUCTION</u>

On December 1, 2025, the United States Attorney's Office in the Eastern District of Pennsylvania filed a one-count information against Kevin Krebs. A Notice of Forfeiture accompanied the information. Count One charged unlawful possession of unregistered destructive devices, in violation of 26 U.S.C. § 5861(d). On December 18, 2025, the defendant appeared for his arraignment, waived prosecution by indictment and pled guilty to Count One of the information.

## II.    <u>FACTS OF THE CASE</u>

On June 14, 2025, a witness reported observing Kevin Krebs place what appeared to be a handgun in his waistband and exit his vehicle.[1] A West Chester Police Lieutenant subsequently approached Krebs' vehicle and observed, in plain view, an AR-15–style rifle on the floor of the rear seating area. Law enforcement then conducted a pedestrian stop of Krebs.

When asked for identification, Krebs stated that he did not have any. After officers observed an empty holster on his left hip, Krebs stated that he was carrying a handgun in his waistband underneath an additional layer of clothing. Officers recovered a fully loaded Sig Sauer P320 handgun, with a round chambered, concealed beneath Krebs' raincoat. In addition to the fully loaded pistol, the following items were found on KREBS' person:

- three (3) loaded Sig Sauer handgun magazines,
- six (6) loaded Assault Rifle magazines,
- an M9 bayonet knife,
- oleoresin capsicum spray, a/k/a pepper spray,
- a pocketknife,

---

[1] This occurred near an active protest held in Chester County that day.

- a ski mask and gloves, and
- a green flag bearing the words "Irish Republic."

Krebs was unable to produce a valid concealed-carry permit and claimed that his permit was at home. He was arrested for carrying a firearm without a license, in violation of 18 Pa. Cons. Stat. § 6106(a)(2).[2]

On June 14, 2025, Krebs was arraigned in Chester County local criminal court. As a condition of bail, Krebs was required to surrender all firearms located at his residence and to reside with his parents at 1694 Yardly Drive, West Chester, Pennsylvania. A firearms records check revealed that between April 18, 2017, and November 2, 2024, Krebs had purchased thirteen (13) handguns, ten (10) of which were registered to him as of June 16, 2025.

On June 16, 2025, Krebs' father surrendered eight (8) of the ten registered handguns to the West Chester Police Department. He also surrendered eleven (11) rifles belonging to Krebs. Krebs' father reported that he recovered these firearms from two gun safes located at KREBS' residence in the 100 block of Conestoga Road, Malvern, Pennsylvania.

Because two of Krebs' registered firearms were unaccounted for, and based on the facts and circumstances of Krebs' arrest, the West Chester Police Department applied for and obtained a search warrant for Krebs' residence.

## SEARCH OF KREBS' RESIDENCE

On June 16, 2025, Chester County Detectives obtained a Commonwealth of Pennsylvania search warrant authorizing a search of Krebs' residence for, among other things, firearms and weapons. That same day, law enforcement executed the warrant.

---

[2] This case is still pending in local criminal court.

During the search, investigators located a suspected destructive device, commonly known as a pipe bomb, along with a container labeled "oxidizer," inside a desk drawer in the attached garage. The device consisted of a metal pipe capped at both ends, with a circuit board and wires attached. Investigators also recovered detailed drawings of grenades and grenade fuses, as well as two military-style body armor vests containing ballistic plates, from the garage.

Based on the presence of the suspected destructive device, investigators evacuated the residence and requested assistance from the Montgomery County Sheriff's Department Bomb Disposal Unit. FBI and ATF Special Agent Bomb Technicians also responded to assist with identification, rendering safe, and transport of the suspected explosive materials.



Bomb Technicians obtained an x-ray of the device and determined that it consisted of a pipe nipple with two metal end caps containing nails and screws, along with an exterior 9-volt battery box, circuit board, and multiple wires. A wire ran from the electrical components into the pipe, consistent with an initiation system for an explosive main charge. The container next to the device held nails, pellets, and an unknown powder. Both items were deemed explosive hazards and were mechanically disassembled.

During a secondary search of the garage, Bomb Technicians located a box labeled "no touch pls." X-ray examination revealed multiple improvised detonators, a mechanical kitchen

timer, a 9-volt battery, and a plastic pill bottle containing powder with an attached improvised detonator. After rendering that device safe, investigators located additional suspected devices inside another metal box. Bomb Technicians identified the following inside the box:

- an aluminum beverage can, which contained a quantity of powder, with a piece of green pyrotechnic fuse inserted into the can and connecting to an expended rifle cartridge casing

- A glass soda bottle which contained a quantity of powder and a piece of green pyrotechnic fuse inserted and protruding from the neck of the bottle. Upon x-raying the glass bottle a suspected improvised rifle cartridge casing initiator was secured to the end of the piece of pyrotechnic fuse

- 11 rifle cartridge casings with a piece of pyrotechnic fuse inserted and protruding from each casing. An x-ray of each of the rifle cartridge casings was obtained revealing the casings contained a quantity of powder

- one metal pipe with two end caps, a light switch, mechanical timer, 9V battery and multiple wires attached to the exterior of the pipe

- one $CO_2$ cartridge with an electric match inserted and protruding from the $CO_2$ container, after which an x-ray revealed a quantity of powder inside

- an additional metal pipe with two end caps, a mechanical timer, wires and after an x-ray an improvised explosive detonator was observed inside the pipe was also recovered in the residence

The recovered items yielded a total of six (6) destructive devices and ten (10) improvised explosive detonators.

Investigators also recovered eight (8) one-pound orange plastic containers containing suspected ammonium nitrate and aluminum powder, a binary explosive mixture that forms an ammonium nitrate and aluminum explosive when combined and is classified as a regulated explosive.

After all devices were rendered safe, law enforcement seized the materials and submitted them to the FBI Explosives and Hazardous Devices Unit at the FBI Laboratory in Huntsville, Alabama, for analysis.

The FBI Explosives and Hazardous Devices Examiner conducted a preliminary examination and identified the disassembled components of five (5) improvised explosive devices ("IEDs"), also referred to as homemade bombs. An IED generally consists of an explosive main charge, an initiation system, and, in some cases, a container or fragmentation enhancements. When properly assembled and initiated, IEDs such as those examined are capable of causing catastrophic consequences.

Two of the five IEDs contained partially constructed initiation systems. Initiation systems provide the energy necessary to cause the explosive main charge to react and may be electric, non-electric, or a combination of both. Devices with weapon-design features—such as hardened metal or glass containers or fragmentation enhancements—are classified as destructive devices due to their enhanced lethality.

The Examiner concluded that all five IEDs met the technical definition of destructive devices. Four utilized metal containers, and one utilized a glass container. Based on field screening results and visual examination, the Examiner presumed the presence of energetic materials.

The first destructive device consisted of an expended $CO_2$ cartridge, suspected energetic material, hobby fuse, and an electric match, forming a combined electric and non-electric initiation system. The device required only the addition of a power source to function as designed.

The second destructive device consisted of a glass Coca-Cola bottle containing suspected energetic material and a non-electric initiation system comprised of hobby fuse and an expended ammunition cartridge casing.

The third destructive device consisted of a metal Guinness beer can containing suspected energetic material and a similar non-electric initiation system.

The fourth destructive device consisted of a metal pipe with two screw-on end caps, suspected energetic material, and an electric initiation system that included a modified mechanical timer, light switch, wiring, 9-volt battery, and improvised initiator.

The fifth destructive device also consisted of a metal pipe with two screw-on end caps, suspected energetic material, and a partially constructed electric initiation system lacking a power source.

The Examiner also examined a partially constructed IED consisting of a metal pipe with end caps, nails, a battery pack, timing circuit, and wiring, but without energetic material or an initiator.

A records query confirmed that none of the above-described destructive devices were registered to Krebs in the National Firearms Registration and Transfer Record.

III.     **SENTENCING CALCULATION**

        A.     Statutory Maximum Sentences

The Court may impose the following statutory maximum sentence:

Possession of an unregistered firearm (destructive device), in violation of 26 U.S.C. § 5861(d): Maximum term of imprisonment of 10 years, 3 years of supervised release, a $250,000 fine, and a $100 special assessment.

B.    Sentencing Guideline Calculation.

The presentence report correctly calculates Krebs' guideline range. The guideline for a violation of 26 U.S.C. § 5861(d)(f) is USSG §2K2.1. The base offense level is 18 since the offense involved a "firearm" as described at 26 U.S.C. § 5845(a).[3] USSG §2K2.1(a)(5). PSR ¶ 24

The instant offense involved more than 3 but not more than 7 firearms.[4] Specifically, the offense involved five destructive devices. Accordingly, 2 levels are added. USSG §2K2.1(b)(1)(A). PSR ¶ 25. The offense involved a destructive device other than a portable rocket, a missile, or a device for use in launching a portable rocket or missile. Accordingly, 2 levels are added. USSG §2K2.1(b)(3)(B). PSR ¶ 26

The resulting total offense level for the underlying offense is 22. The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b). Based upon a total offense level of 19 and a criminal history category of I, the guideline imprisonment range is 30 months to 37 months. PSR ¶ 78.

## IV.    Mental Health Evaluation

The government has reviewed the psychological evaluation submitted on the defendant's behalf and does not dispute that the Court may consider the report under 18 U.S.C. § 3553(a). The report concludes that the defendant suffers from a neurodevelopmental disorder identified as autism spectrum disorder, together with depression, anxiety, and paranoia, which the evaluator

---

[3] Subsection (a)(8) of this statute lists a destructive device as a firearm.
[4] The United States Sentencing Commission uses the definition of "firearm" in 18 U.S.C. § 921(a)(3).

attributes in part to significant neglect during the defendant's early childhood. The evaluator further concludes that these conditions produce functional limitations affecting judgment, problem solving, and daily living skills and recommends ongoing cognitive behavioral therapy, psychiatric medication management, and limited guardianship.

The report, however, should be afforded only limited weight in determining the appropriate sentence. Although it reaches significant diagnostic conclusions, it provides little explanation regarding the factual materials reviewed, does not adequately identify the records relied upon in reaching its opinions, and does not meaningfully explain the testing methodology employed or how the underlying testing data supports the evaluator's ultimate conclusions. Without greater transparency regarding the basis for those opinions, the Court should exercise caution before relying upon the report as a basis for varying from the advisory guideline range.

More importantly, even accepting the evaluator's conclusions in full, they do not support a sentence below the advisory guideline range. Indeed, the report describes permanent, lifelong conditions that will require ongoing treatment, medication management, and external support. The evaluator expressly recognizes that the defendant's functional limitations are expected to remain permanent and can only be medically managed through consistent treatment and supervision. The record also demonstrates that successful management of these conditions depends upon the defendant's willingness to comply with treatment. The evidence before the Court reflects that, prior to his arrest, the defendant failed to take prescribed medication for an extended period of time, as evidenced by the quantity of unused medication recovered from his residence. That history raises legitimate concerns regarding future compliance. If the defendant chooses not to participate in treatment or medication management, the same impairments affecting his judgment and decision making remain, while the risk to the public increases. Given the extraordinary dangerousness of

the conduct in this case (the possession of multiple improvised explosive devices, detonators, explosive precursor materials, and numerous firearms) those concerns weigh in favor of, not against, a guideline sentence.

Further, the prescribed treatment is not inconsistent with a custodial sentence. To the contrary, the Bureau of Prisons is well equipped to evaluate, monitor, and treat inmates suffering from significant mental health conditions. The Bureau routinely provides psychiatric evaluations, medication management, individual counseling, cognitive behavioral programming, and other mental health services. A sentence within the advisory guideline range therefore permits the defendant to receive appropriate treatment while simultaneously satisfying the statutory goals of punishment, deterrence, and protection of the public. Upon release, the Court may also impose appropriate supervised-release conditions to encourage continued treatment and medication compliance.

## V.    ANALYSIS

The Court must consider all the sentencing factors set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

1.      **The nature and circumstances of the offenses and the history and characteristics of the defendant.**

The seriousness of this offense cannot be overstated. Congress has chosen to regulate destructive devices separately from ordinary firearms because of their extraordinary capacity to inflict death, serious bodily injury, and widespread destruction. The devices recovered from the defendant's residence were not collector's items, curiosities, or theoretical designs. They were homemade explosive weapons.

Particularly troubling is the number and variety of devices recovered. Investigators found multiple pipe bombs, explosive-filled containers, improvised detonators, timing mechanisms, electrical firing systems, fragmentation enhancements, and explosive precursor materials. The presence of numerous devices demonstrates planning, experimentation, and sustained involvement with explosive construction rather than an isolated act.

The design features of the devices further underscore their dangerousness. Several incorporated nails, screws, or metal containers that would have fragmented upon detonation. Such features serve no benign purpose. They exist to increase the destructive and injurious effects of an explosion. As the FBI examiner concluded, the devices were capable of causing property damage, serious injury, and death. These were not merely collections of parts or chemical precursors. Several devices already contained energetic material, initiation systems, or both, and others required only minimal additional steps before they could function as designed.

Moreover, the danger presented by the defendant's conduct was not hypothetical. Law enforcement officers executing a lawful search warrant encountered active explosive hazards that required evacuation of the residence and intervention by specialized bomb technicians. Every individual required to secure, examine, transport, and dismantle these devices faced risks created solely by the defendant's conduct.

The surrounding circumstances amplify these concerns. At the time of his initial arrest, the defendant was carrying a loaded handgun and possessed substantial quantities of ammunition, magazines, and tactical equipment. The subsequent search revealed a large collection of firearms, body armor, explosive devices, explosive precursor materials, and drawings relating to grenades and grenade fuses. Taken together, these facts paint a deeply concerning picture of an individual who had devoted significant time and effort to acquiring weapons and constructing explosive devices.

The government has reviewed the psychological evaluation submitted on the defendant's behalf and recognizes that the Court may consider those findings under § 3553(a). Nothing in the evaluation, however, changes the central sentencing considerations presented by this case. Regardless of any diagnoses or mitigating circumstances identified by the evaluator, the defendant possessed multiple destructive devices, explosive materials, and improvised detonators that created an extraordinary risk to the public and to responding law enforcement officers.

Those facts continue to warrant a guideline sentence. The government respectfully submits that any mental-health evidence offered in mitigation must be evaluated alongside the extraordinary danger posed by the defendant's conduct. Whatever explanation may exist for the defendant's actions, the Court cannot lose sight of the fact that law enforcement recovered multiple destructive devices, explosive materials, and detonators from his residence. The seriousness of that conduct remains unchanged.

2.      **The need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses and the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

A within-guidelines sentence is necessary to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

First, such a sentence reflects the seriousness of the offense. Homemade explosive devices represent one of the most dangerous categories of unlawful weapons. Unlike many firearms offenses, explosive devices create risks that extend well beyond any intended target. Their effects are often indiscriminate and can injure bystanders, neighbors, first responders, and anyone in the vicinity of a detonation.

Second, a guideline sentence promotes respect for the law and provides just punishment. The defendant did not merely possess explosive components. He possessed multiple destructive devices and numerous detonators, many of which were functional or readily capable of being rendered functional.

Third, a guideline sentence serves the important goal of deterrence. Individuals who choose to manufacture, possess, and stockpile explosive devices must understand that such conduct carries significant consequences. Because the consequences of even a single improvised explosive device can be catastrophic, meaningful sentences are particularly important to deter others who may contemplate manufacturing or stockpiling such devices.

Finally, a guideline sentence is necessary to protect the public. The combination of explosive devices, detonators, precursor materials, firearms, ammunition, body armor, and related materials demonstrates a level of dangerousness that warrants substantial punishment and supervision.

       **3.**       **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

As describe earlier, the defendant's needs for educational or vocational training, medical care, or other correctional treatment in the most effective manner can be met by the Bureau of Prisons.

4.      **The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Adherence to the recommended guideline range is generally the best course for assuring that the defendant's sentence is consistent with those imposed nationwide on similarly-situated offenders.  Section 3553(a) is designed to ensure sentencing consistency among similarly situated defendants across the entire nation.  *See United States v. Parker*, 462 F.3d 273 (3d Cir. 2006); *United States v. Carson*, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct not disparities between codefendants.'"). A sentence within the advisory guidelines range will therefore contribute to nation-wide consistency in sentences.

## VI.    <u>CONCLUSION</u>

This offense involved not one destructive device, but an arsenal of homemade explosive weapons, improvised detonators, and explosive materials that required specialized bomb technicians to secure safely. A sentence within the advisory guideline range appropriately reflects the extraordinary danger presented by the defendant's conduct, protects the public, promotes respect for the law, and provides just punishment. The government therefore respectfully requests that the Court impose a sentence within the advisory guideline range of 30 to 37 months' imprisonment.

Respectfully submitted,

DAVID METCALF
United States Attorney


/s/ *Everett Witherell*
EVERETT R. WITHERELL
FRANK MENNA
Assistant United States Attorneys


Dated: July 7, 2026

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on the following counsel electronic filing on this date:

Christian J. Hoey, Esquire
50 Darby Road Paoli, PA 19301
610-647-5151
cjhoey@hoeylegal.com

/s/ Everett Witherell
Everett Witherell
Assistant United States Attorney

Dated: July 7, 2026